## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **TANYA CLEMENT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00963** |
| | ) | **Judge Aleta A. Trauger** |
| **THE SURGICAL CLINIC, PLLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM

Before the court is the Motion for Summary Judgment filed by defendant The Surgical Clinic, PLLC ("TSC"). (Doc. No. 14.) For the reasons set forth herein, the motion will be granted.

## I.      FACTS AND PROCEDURAL HISTORY

Plaintiff Tanya Clement, a former employee of TSC, filed suit in the Chancery Court for Davidson County, Tennessee on September 28, 2020, asserting claims against TSC for (1) discrimination and retaliation in violation of the Emergency Family and Medical Leave Expansion Act ("EFMLEA"), enacted as part of the Families First Coronavirus Response Act ("FFCRA"), Pub. L. No. 116-127, 134 Stat 178 (March 18, 2020); and (2) reverse race discrimination and retaliation in violation of the Tennessee Human Rights Act ("THRA"). (Doc. No. 1-2.) TSC promptly removed the case to federal court on the grounds of federal question jurisdiction. (Doc. No. 1.)

The defendant has now filed its Motion for Summary Judgment, supporting Memorandum of Law, and Statement of Undisputed Material Facts (Doc. Nos. 14, 15, 16), as well as a substantial amount of evidentiary material, including transcripts of the plaintiff's and several witnesses' depositions (some partial and some complete), along with documentary evidence introduced as

exhibits to the various depositions, and the Declaration of Debbie Fuqua, TSC's Area Manager since January 2020. (Doc. Nos. 17-1 through 17-8.) The plaintiff has filed her Response in opposition to the Motion for Summary Judgment, Response to the Statement of Undisputed Material Fact, her own Statement of Additional Facts, and her own evidentiary material. (Doc. Nos. 20, 21, 22, 23-1 through 23-13.) The defendant filed a Reply and a Response to the plaintiff's Statement of Additional Facts. (Doc. Nos. 25, 26.) The relevant facts gleaned from this evidentiary material are as follows.[1]

### A. Clement's Employment at TSC

TSC is a Tennessee professional limited liability company with its principal office in Nashville, Tennessee. It operates eighteen clinics in the middle Tennessee area. Tanya Clement, who is White, worked as a Medical Assistant ("MA") at TSC's "Downtown Clinic" in Nashville from December 2018 until June 2020. Through January 2020, Clement worked under former Clinic Manager Kaila Hordos, who is also White. Under Hordos's management, Clement was permitted to work a schedule that fit her personal needs. In particular, her earliest start time was 8:00 a.m., which permitted her to drop her daughter off at daycare and make the commute to Nashville from her home in Clarksville, Tennessee. Two days a week, she had a delayed start time to enable her to attend class at Nashville State Community College. As a result, her regularly

---

[1] The facts for which no citation is provided are undisputed for the purposes of the Motion for Summary Judgment, unless otherwise indicated, and are drawn from the pleadings (Doc. Nos. 1-2 (Complaint), 6 (Answer)) or from the plaintiff's Response to the Defendant's Statement of Undisputed Material Facts (Doc. No. 21).

The court has disregarded the plaintiff's Statement of Material Facts. (Doc. No. 22.) It is improperly formatted as questions followed by the plaintiff's answers, and it consists entirely of argument in support of which it cites facts that are already presented in the plaintiff's Response to the defendant's Statement of Undisputed Facts and incorporated herein.

scheduled hours were 8:00 a.m. to 4:30 p.m., Tuesday, Thursday, and Friday, and 10:00 a.m. to 4:30 p.m. on Mondays and Wednesdays, the days she attended school.

During this time period, Clement was primarily assigned to work with Dr. Marc Rosen, a general surgeon, but she also worked in triage and occasionally with other doctors. Her job duties included helping Dr. Rosen with patient care by, for instance, removing staples, changing bandages and wound VACs, and handling charts, paperwork, and telephone calls. The plaintiff loved working at TSC and found it to be a good environment for her.

### B.     TSC Hires Gabrielle Taylor and Lindsey Ochoa-Ryan

As of January 2020, over 90% of TSC's physician-owners and 100% of its administrative staff were White, including Chief Operating Officer Kevin Finn. On January 30, 2020, TSC hired Gabrielle Taylor, who is Black, to replace Hordos as the new manager of its Downtown Clinic. Around the same time, TSC hired Lindsey Ochoa-Ryan, who is White, as its Human Resources Manager. It also promoted Debbie Fuqua (also White) to the position of Area Manager.

As Area Manager, Fuqua was responsible for supervising and training eleven managers who ran more than eleven TSC sites and satellite clinics. The Downtown Clinic saw 500 patients a week and had ten physicians and two mid-level providers who also ran clinics, which made for a machine with a lot of moving parts. (Fuqua Dep. 69.)[2] Fuqua testified that she was responsible for ensuring that schedules for doctors and staff were put together in such a way that TSC could competently care for patients. (Fuqua Dep. 12.) The plaintiff disputes that Fuqua was solely responsible for the schedules and asserts that Taylor began "putting out the schedule on her own"

---

[2] The deposition transcripts provided to the court by both parties are in condensed format. They are located in the docket with the defendant's exhibits (Doc. Nos. 17-1 through 17-7) and the plaintiff's (Doc. Nos. 23-1, 23-5, 23-7, and 23-10 through 23-13). The court refers to the depositions by referencing the deponent by last name and the original transcript pagination, rather than the CM/ECF document numbers or the pagination provided by CM/ECF.

about two weeks after she was hired, at which point the plaintiff's schedule "completely changed." (Clement Dep. 21, 26–28.)

### C. Clement's First Few Weeks of Working with Taylor

Clement alleges in her Complaint that, almost immediately after Taylor was hired, Clement felt "targeted, bullied, and discriminated against by Taylor because of her race." (Doc. No. 1-2 ¶ 7.) Clement testified that she believed Taylor discriminated against her because, as soon as Taylor started putting schedules together, beginning with the schedule for the week of February 10, 2020, Clement was "placed in multiple clinics all week by [herself], and it was an unfair workload for [her], and nobody else was put in that same position." (Clement Dep. 21.) Clement admits, however, that other White employees were on the schedule, and she is not aware that any of them had problems with their schedules. (Clement Dep. 22–23.) The reason she thought the scheduling issues that affected her were racially motivated was because they happened to her more than once, including after she "confronted" Taylor about her schedule being unfair, but "nothing was done about it." (Clement Dep. 23.) She also claims that "employees of other races other than white were not put in the situation [she] was in regards to the schedule," but she could not answer why Taylor singled her out, but not other White employees, with an unfair schedule. (Clement Dep. 22, 23.)

On Friday, February 14, 2020, when the schedule for the week beginning February 17, 2020 came out, Clement again complained to Taylor that the schedule was unfair. (Clement Dep. 38.) According to Clement, she told Taylor that the schedule she had put together would not be "feasible" for Clement, and they had a conversation about it that included Karen Witthauer,[3] a

---

[3] The parties spell Witthauer's name as both "Witthauer" and "Whithauer." "Witthauer" is the spelling used in this witness's deposition and the one adopted by the court.

White nurse. Taylor, however, would not "budge" on letting Clement out of "triage" or giving her more help. (Clement Dep. 42.)

After her February 14 confrontation with Taylor, Clement went over Taylor's head and sent a text directly to TSC's Chief Operating Officer, Kevin Finn (who is White), asking for a meeting with him and Taylor. (Doc. No. 17-1, at 37.) Clement explained that her reasons for requesting a meeting were that her schedule for the next week was unfair and that the way she was being spoken to was "unacceptable." (*Id.*) After sending the text to Finn, Clement submitted her written resignation, effective February 14, 2020, citing the same reasons. (Clement Dep. 42–43; *see also* Doc. No. 17-1, at 42.) Within two hours, Finn texted Clement with a schedule that was revised to the plaintiff's satisfaction; he suggested that she speak with HR about her other concerns. Finn also called her and persuaded her not to resign. (Clement Dep. 44–45.) Clement was allowed to rescind her notice of resignation.

On February 17, 2020, HR Manager Lindsey Ochoa-Ryan called Clement to request a meeting to discuss the "altercation" she and Taylor had had on February 14 (*see* Clement Dep. 46) and the accusation that Clement had called Taylor a "bitch" in front of other TSC employees (Ochoa-Ryan Dep. 83–84). Clement told Ochoa-Ryan her version of the incident and denied using "colorful language." (Clement Dep. 41–42.) Ochoa-Ryan investigated the accusation by interviewing other employees who witnessed the incident. On February 20, 2020, Ochoa-Ryan had a follow-up meeting with Clement to advise her that some of the employees she had interviewed had confirmed that Clement had used "colorful language" in her altercation with Taylor, but others had not. (Clement Dep. 43–44.) Ochoa-Ryan told her that, as a result, her investigation was inconclusive. (Clement Dep. 44.) No disciplinary action was taken against the plaintiff. According to Ochoa-Ryan, the plaintiff's being permitted to rescind her resignation and return to work, even

after having been accused of cursing at her co-workers, served to "embolden her behavior," because Clement then "felt like she could basically do what she wanted to." (Ochoa-Ryan Dep. 48, 85.)

### D. Co-Worker Complaints About Clement

Even before the February 14 incident, several of the plaintiff's co-workers had complained to Taylor about her. On February 11, 2020, Diana Sifuentes (Hispanic) sent an email to Courtney Joseph and Taylor regarding the "hostility that's been going on here lately." (Doc. No. 17-1, at 32.) Sifuentes stated that Clement had been making work uncomfortable and giving her a "dirty look" every time she passed her in the hall. (*Id.*) Sifuentes felt that Clement was "talking bad" about her and others and was "giving off a vibe that she doesn't want you around." (*Id.*) Clement does not dispute that Sifuentes sent this email, but she denies that she was giving Sifuentes dirty looks, talking bad about her or others, or trying to make Sifuentes's work environment uncomfortable. (Clement Dep. 28.) She denies having problems with Sifuentes prior to February 11. (*Id.*)

Also on February 11, 2020, Courtney Joseph (White), then also employed by TSC as an MA, emailed Taylor complaining about "a lot of hostility and attitude coming from" Clement and that Clement had given her "dirty looks," refused to acknowledge her when Joseph spoke to her or asked her a question, and generally was disrespectful toward her. (Doc. No. 17-1, at 33.) On February 14, 2020, Joseph sent a second email to Taylor, also copied to Finn and Fuqua, again complaining that, ever since Taylor had announced Joseph's selection as "MA lead," she had received "hostility, hurtful words, and lack of respect" from Clement, had felt "bullied and threatened," had been the recipient of dirty looks and rude comments, and had been completely ignored when she tried to talk to Clement about work-related matters. (Doc. No. 17-1, at 34.) Clement does not dispute that Joseph sent these emails, but she denies that she engaged in any of

this behavior. (Clement Dep. 30, 32.) She also denies having seen this email prior to her deposition and, in her deposition, took the position that Joseph had "just made all of this up." (Clement Dep. 32.)

Also on February 14, 2020, Taylor Wilson (White), another MA, emailed Taylor, Finn, and Fuqua a "Formal complaint" about a "rumor" she had heard that Karen Witthauer and Clement were talking behind her back about how she could not handle her workload. (Doc. No. 17-1, at 36.) Wilson disputed the truth of that rumor and expressed her belief that Taylor was "doing a wonderful job incorporating team building skills, better work ethics, and overall moral[e] within the clinic" and that "[e]veryone needs to get on board," including Clement. (*Id.*) Clement denied ever having a disagreement with Wilson. (Clement Dep. 35.)

Sifuentes sent Taylor a second email on February 14, 2020, stating that, starting the previous week, Clement was "making it obvious that she has a problem" with Sifuentes and Joseph, making her feel uncomfortable to the point that she did not want to come to work, because she did not "want to deal with [Clement], the drama, or the gossip." (Doc. No. 17-1, at 41.) In her deposition, Clement denied the accusations in Sifuentes's email. (Clement Dep. 40.)

These complaints, however, made their way to Ochoa-Ryan, who had "several conversations" with both Clement and Taylor, "trying to get them on the same page," and asking Clement to "please respect [Taylor] and the schedule that she had put together." (Ochoa-Ryan Dep. 31.) Ochoa-Ryan also testified that she had "several coaching conversations" with Clement before Clement went out on EFMLEA leave on April 1, 2020. (*Id.*) She claimed that Clement would have been aware of the complaints about her and that the "coaching conversations" also addressed the issues raised by these complaints—Clement's attitude, lack of respect, and failure to follow the chain of command. (Ochoa-Ryan Dep. 91–92.) Clement denies that the co-worker

complaints were ever brought to her attention until after she was already on leave, pointing to an email to her from Gabrielle Taylor, dated May 22, 2020. That email (discussed in more detail below), begins by stating that, before Clement returned from leave, Taylor "need[ed] to make [her] aware that there have been several . . . written and verbal complaints about [her] behavior" and that "these complaints" were going to be addressed with the plaintiff before she went on leave, but "due to the circumstances we were not able to discuss these complaints with you at that time." (Doc. No. 23-3, at 14.) Prior to going on leave, Clement had not been formally disciplined in any way.

### E. Continuing Issues Concerning the Plaintiff's Schedule

As set forth above, at the time Taylor was hired, Clement was working a modified schedule, in accordance with a prior verbal agreement with former Clinic Manager, Kaila Hordos, to accommodate the plaintiff's ability to attend classes at Nashville State Community College and her ability to drop her young daughter off at daycare and then make the forty-five-mile commute from Clarksville, Tennessee to Nashville. On this schedule, Clement's hours on Mondays and Wednesdays—the days she attended class—were 10 a.m. to 4:30 p.m. Her schedule on the other days—Tuesdays, Thursdays, and Fridays—was 8:00 a.m. to 4:30 p.m.

The plaintiff's schedule became an ongoing issue after Taylor was hired. Although the record on this is not clear, Taylor apparently believed that the plaintiff was supposed to start at 7:30 on the days she did not have class and that she was consistently tardy. On February 24, 2020, a few weeks after Taylor started, Finn, Ochoa-Ryan, and Taylor exchanged emails to clarify what exactly Clement's work schedule was supposed to be. Fuqua asked Finn to confirm that Clement's hours were 10:00 to 4:30 Mondays and Wednesdays and 7:30 to 5:00 on Tuesday, Thursday, Friday, based on what Clement had allegedly told Fuqua and Taylor. (Doc. No. 17-2, at 33.) Finn confirmed that these were the hours Hordos had given him. (*Id.*) The plaintiff, however, objected

to this schedule on the basis that it was actually not what she and Hordos had agreed upon (or what she had told Fuqua and Taylor). In particular, the daycare center attended by Clement's daughter did not open until 6:00 a.m. and the commute from Clarksville took a minimum ninety minutes, making it difficult for Clement to consistently be at work before 8:00 a.m.

This issue regarding her hours was eventually resolved to the plaintiff's satisfaction. On March 13, 2020, Clement, Fuqua, and Taylor signed a written agreement ("schedule agreement") "honor[ing] the verbal agreement" Clement had made with Hordos. (Doc. No. 23-3, at 6.) The schedule agreement expressly spelled out the plaintiff's schedule: 10:00 a.m. to 4:30 p.m. on the two days she had class and 8:00 a.m. to 4:30 p.m. on the days she did not have class. The schedule agreement also made explicit the expectation that Clement adhere to the TSC Policy and Procedures Manual and references TSC's policy of according points for tardiness and unapproved absences that would be in effect from the day of the schedule agreement forward. (*Id.*) According to the plaintiff, no one talked to her in conjunction with this agreement about how many times she had been tardy prior to its effective date. (Clement Dep. 64.)[4]

F.     **The Deteriorating Relationship Between Clement and Taylor**

Meanwhile, aside from the back and forth regarding the plaintiff's hours, the plaintiff's relationship with Taylor did not improve. In mid-March, Fuqua observed Taylor crying in her office after Clement told her she would not speak to her unless there was a witness present. (Fuqua Dep. 84–85; Clement Dep. 56–57; Doc. No. 17-2, at 34.) According to Clement, after she

---

[4] On the same date, Kevin Finn distributed an email to "everyone involved" concerning this agreement, indicating that Analine Jimenez, another MA at the Downtown Clinic, was party to a similar arrangement. (Doc. No. 23-3, at 4.) His email confirms that TSC would "honor the verbal agreement" made between Clement, Jimenez, and former manager Hordos, allowing both of them "to attend school during TSC working hours during the clinic time" and to work from 8:00 to 4:30 on the days that school was not in session. (Doc. No. 23-3, at 4.)

complained to Dr. Cooper about how Taylor was treating her, he advised her not to speak to Taylor without someone else present and to record any conversations she had with her. (Clement Dep. 58.)

Fuqua testified that she personally witnessed Clement behaving disrespectfully toward Taylor by using a rude, belligerent tone of voice and rolling her eyes. (Fuqua Dep. 54.) She did not remember more specifics. (*Id.*) The plaintiff testified that she had problems with Taylor because of the way Taylor treated her "compared to other people in the office," specifically with respect to the scheduling issue and belittling her in front of other people. (Clement Dep. 59.) Clement recalled that Taylor "rais[ed] her voice" to her, telling her that if she "jump[ed] the chain of command again" by going directly to the doctors with whom she worked, "there would b[e] an issue." (Clement Dec. 59.)

On March 16, 2020, Clement notified TSC that Covid was impacting her children's school and daycare and that her daughter's daycare would be closing due to a positive Covid case. Sometime between that date and the end of March, Clement notified TSC that she would need to take leave. (*See* Clement Dep. 65–66.) On March 31, 2020, Clement completed EFMLEA paperwork (provided to her by TSC) for leave beginning April 1, 2020, and TSC provided her with paid EFMLEA leave beginning that day. No one at TSC expressed any displeasure or gave Clement a hard time about taking leave.

On March 23, 2020, shortly before the plaintiff went out on EFMLEA leave, another co-worker, Takella Pruitt (who is Black), sent Taylor an email stating that she had been in clinic training that day with Clement and Dr. Rosen and complaining that she did not learn much because Clement told her she did not want to train her, though she also offered to help her with whatever she needed. (Doc. No. 23-3, at 9.) In her deposition, Clement explained that, although Taylor had asked her to train Pruitt, she had told Taylor that she just did not have time and needed to catch up

on things for Dr. Rosen. (Clement Dep. 73.) Clement understood that Pruitt was going to be filling in for her, helping Dr. Rosen, while she was at school. (Clement Dep. 73.) Clement denied speaking to Taylor in a rude or disrespectful way when she told her she did not have time to train Pruitt on that particular day and also claimed that she had spent time on training Pruitt on a previous day. (Clement Dep. 74.)

Karen Burr, a White front-desk receptionist, testified that Clement sat not far from her and that it was "very evident" early on that Taylor and Clement did not like each other. (Burr Dep. 9.) At some point, she mentioned to Taylor that the atmosphere was very uncomfortable because of the relationship between Taylor and Clement, and Taylor asked her to put something in writing. (*Id.* at 14.) On March 31, 2020, Burr typed up a memorandum that she gave to Taylor. (*Id.*) The memo stated that she had been made to feel very uncomfortable by seeing and hearing the "total disrespect shown by a fellow coworker toward the Manager" during two recent incidents. (Doc. No. 17-6, at 25.) Burr stated in her deposition, "I did not put [Clement's] name in it, because we both knew who I was talking about." (Burr Dep. 16.) She stated that, any time Clement was asked to do something she did not want to do, she "copped a little bit of an attitude, which affected the whole atmosphere." (*Id.*)

In an email dated April 7, 2020, after Clement had already gone on leave, another White MA named Kimberly Wotton emailed Taylor, stating that she had returned from a leave of absence to find a "working environment . . . full of tension and negativity." (Doc. No. 23-3, at 12.) She stated that she had heard Clement made snide remarks about Taylor "in the breakroom, elevator, around the office," and that the "negativity and disrespect" conveyed by Clement made the work environment "very uncomfortable." (*Id.*)

On April 6, 2020, Taylor emailed Ochoa-Ryan, stating that, although Clement had told her that she could come to work on Mondays because she had childcare on that day, she had not shown up that day or contacted Taylor. (Doc. No. 23-3, at 11.) Taylor also denied having received Clement's EFMLEA paperwork by that time. She reported that Clement had "refused to train" Pruitt because it was "not in her job description" and had continued to be disrespectful and to refuse to do anything Taylor asked her to do. She stated:

> I have documentation from Karen [Burr], Kim [Wotton], Diana [Sifuentes] and Takella [Pruitt] for proof of this and I have been keeping Dr. Rosen in on the loop of everything and we have his full support. I'm defiantly [sic] ready to let her go.

(Doc. No. 23-3, at 11.) No action was taken, however, while the plaintiff was out on leave. Fuqua testified, however, that she was not aware of any circumstances preventing TSC from discussing the complaints that Taylor had already gathered with Clement before she went on leave on April 1, 2020. (Fuqua Dep. 97.)

### G. The End of the Plaintiff's Employment at TSC

On Wednesday, May 20, 2020, Clement emailed Ochoa-Ryan and Taylor to let them know she planned to return to work on June 4. (Doc. No. 23-8, at 36.) Taylor conferred with Ochoa-Ryan about how to handle this return. In a response email, Ochoa-Ryan advised Taylor that they "had to let her return based on the rules on EFMLEA or we will get fined" but that they also needed to address the employee complaints and Clement's attitude toward Taylor. (Doc. No. 23-8, at 35.) Ochoa-Ryan confirmed that, if Clement "cannot correct her behavior, then we will let her go," and that she needed to work the hours Taylor set for her, since (as Ochoa-Ryan erroneously believed at the time) Clement would not be in school for the summer. (*Id.*) Ochoa-Ryan coached Taylor to sit down with Clement on her first day back and let her know that her attitude would not be tolerated, that there had been several employee complaints about her attitude, and that, since she was not in school, she needed to work the schedule set for her. (*Id.*) Ochoa-Ryan added:

> I am sure all of this will send her over the edge. Then she will get upset, then we will have to tell her if she cannot work the schedule then we will have to let her go.
>
> So technically we let her come back and let her go at the same time. Either the attitude issue or the schedule issue is going to set her off.
>
> If I were you, I would send her the schedule beforehand . . . . Then we are covered because we were going to let her return, but she could not work the schedule.

(*Id.*)

On May 22, 2020, Taylor sent Ochoa-Ryan and Fuqua a draft of the email she intended to send to Clement, asking them to "clear" it before she sent it. (Doc. No. 23-8, at 39.) Ochoa-Ryan returned the draft to her with recommended edits. She also thanked Taylor for her patience and noted that they were "doing this the right way so that we know if [Clement] ever made some kind of complaint we are covered." (Doc. No. 23-8, at 38.) Taylor incorporated Ochoa-Taylor's recommendations into the email she sent to Clement later the same day, copied to Dr. Rosen, Fuqua, and Ochoa-Ryan, stating, in relevant part that, before Clement returned, Taylor needed to "make her aware" of written and verbal complaints about her behavior from other staff members and changes that would be made upon Clement's return, "[d]ue to the amount of complaints." (Doc. No. 23-8, at 37.) Most notably, Taylor informed her that:

> (1) the prior written schedule agreement would be "null until COVID is over" and that, due to demand, her new hours would be 7:30 a.m. to 4:00 p.m. with a half-hour lunch break;
>
> (2) upon her return, she would be the "fulltime triage medical assistant for the 3rd and 4th floor, helping up front with incoming phone calls if need be as well as participating in training people" but would be "allow[ed] to assist in Rosen's clinic on Monday if they need assistance"; and
>
> (3) her new workspace would be in triage on the 4th floor.

(*See* Doc. No. 23-8, at 37.)

Clement testified that Taylor's email took her by surprise, so she emailed Finn to request a meeting. Finn must have contacted Ochoa-Ryan to ask what the issue was, because Ochoa-Ryan

emailed him on May 26, 2020 explaining that the "issue is that there were several complaints made by other employees about [Clement's] attitude and not being willing to get along with others," all of which were documented in writing. (Doc. No. 23-8, at 42.) In addition, there was the "issue" of Clement's "blatant disrespect towards" Taylor. (*Id.*) Ochoa-Ryan explained that all of this "was going to be addressed with [Clement] and the whole covid thing happened and she requested leave, so due to the [EFMLEA] rules we had to leave it alone . . . because we could not fire her after she requested leave. I told [Taylor] that we would address when [Clement] was ready to return." (*Id.*)

Ochoa-Ryan also stated that Rosen was on board and was satisfied with the "newer" MA he had been working with, Takella Pruitt, while Clement was on leave. Ochoa-Ryan noted that she had encouraged Taylor to "get Rosen on her side" so that Clement could not leverage him to "act however she wants" and that Clement's "ability to run to [Finn] and Rosen has emboldened her to act and say what she wants." (*Id.*) Ochoa-Ryan opined that, if Clement were allowed to return without a clear understanding of what attitude adjustments needed to be made, then Taylor was going to quit, and it was easier to replace an MA than a manager. She asked Finn not to respond at all or, if he did, to tell Clement that it was an HR matter and that she should speak with Ochoa-Ryan directly. (*Id.*)

On May 27, 2020, Clement emailed Ochoa-Ryan, copying Taylor, Finn, and her attorney, stating that she felt that they were "essentially terminating" her, because all of them were aware that she was unable to work a schedule beginning at 7:30 a.m., and that she was "filing a formal complaint" of discrimination "due to [her] Caucasian race." (Doc. No. 23-8, at 43.) In addition, she stated her belief that the terms of her return violated the Family and Medical Leave Act ("FMLA"), which requires that, when an employee returns from FMLA leave, she must be "restored to the same job or to an 'equivalent.'" (*Id.*) She believed that the triage position outlined

in Taylor's email was "not equivalent to [her] position prior to going on leave." (*Id.*) She also requested a meeting to address the "alleged formal documented complaints" that had been placed in her personnel file. (*Id.*)

According to the plaintiff, the offered position as a fulltime triage MA was not substantially equivalent to her former position, when she worked primarily for a single doctor. She alleges that, because the position is monotonous and undesirable, no other MAs had ever been assigned to triage full time. (Fuqua Dep. 100.) Instead, MAs normally rotated through the position. (Witthauer Dep. 16.) She also points out that TSC's job description for MAs lists sixteen "essential functions," of which triage is only one. (Doc. No. 23-6, at 51.) Fuqua testified, however, that, with the pandemic raging, the Downtown Clinic was "looking for stability and we wanted to have somebody there that could be there all of the time." (Fuqua Dep. 98–99.) She added, "[w]e were short-staffed, people were out, we were barely holding it together." (Fuqua Dep. 99.)

Pursuant to the plaintiff's request for a meeting, Ochoa-Ryan and Fuqua met with Clement on June 2, 2020. According to the plaintiff, she reiterated during this meeting her belief that Taylor was discriminating against her based on her race, but TSC did not launch a formal investigation into this complaint. Ochoa-Ryan testified that she did not believe a formal investigation was indicated; she reviewed all of the relevant information and discussed the matter with the plaintiff before concluding that her complaints had been adequately addressed and that there was nothing to investigate. (Ochoa-Ryan Dep. 41–42, 92.)

According to the synopsis of the June 2 meeting prepared by Fuqua, Clement reiterated her belief that Taylor was "discriminating against her" and stated that she had "an issue" with coming to work at 7:30 rather than 8:00 because of the daycare center's schedule and her lengthy commute from Clarksville. (Doc. No. 23-9, at 1.) She objected to being transferred to another MA position

at the clinic, complained that Taylor had gone through her personal belongings in her work desk while she was on leave and "thrown away" her possessions, and expressed her belief that the complaints against her were fake and made up by Taylor. (*Id.*) The synopsis also noted Ochoa-Ryan's responses to the plaintiff's complaints, including that "TSC can ask employees to work the hours that their manager deems necessary for the clinic between the hours of 7:30 to 4:30 pm, that personal belongings in a work desk can be moved by a manager," that the complaints from co-workers were real, and that TSC had the ability to move MAs laterally to meet its needs, particularly in light of the pandemic and the "ramp up of clinics while practicing TSC Pandemic Protocol." (*Id.*) The plaintiff conceded during her deposition that the pandemic changed the needs of the clinic during this time frame. The meeting ended with the understanding that the plaintiff would remain on paid leave for an additional two weeks.

After the June 2 meeting with Ochoa-Ryan and Fuqua, the plaintiff had another meeting with Ochoa-Ryan that the plaintiff recorded. During this meeting, Ochoa-Ryan conveyed to the plaintiff that she had determined that Clement needed a fresh start at a different TSC location, given the circumstances and the ongoing tension between Clement and Taylor. Clement also told Ochoa-Ryan that her summer class schedule required her to log onto her computer and listen to a lecture from 10:05 a.m. to 12:50 p.m. on Mondays and Wednesdays. Ochoa-Ryan told the plaintiff that she would reach out to other locations to see if they could accommodate her school schedule and 8:00 a.m. start time. (Clement Dep. 98.)

On June 9, 2020, Ochoa-Ryan reached out to Stacey Clark, the Clinic Manager at the Vein Center, another TSC location, asking whether she might have an opening for an MA who was coming off of EFMLEA leave on June 16 and needed a "new clinic to move to." (Doc. No. 17-2, at 50.) Ochoa-Ryan described Clement as a "hard worker" and "smart," but she "need[ed] a fresh

start at a new clinic." (*Id.*) She also noted that Clement had some "scheduling requirements," including that she needed an 8:00 a.m. start time as well as an ability to log into her class from her laptop from 10:05 to 12:50 on Mondays and Wednesdays. (*Id.*) Clark responded that she would "talk with [her] doctors" and reply shortly.

Clark's response is not in the record, but it appears that she told Ochoa-Ryan that her clinic would be willing to take on Clement and to accommodate her scheduling needs. On June 17, 2020, however, Ochoa-Ryan emailed Finn and Fuqua to inform them that she had told Clement that she had an "opportunity at the Vein Center and that Stacey Clark would love to have her there" but that, regardless of where she went, TSC was not willing to accommodate her school schedule, as it was "during the clinic's busiest times and days." (Doc. No. 23-9, at 7.) According to this email, Clement then told Ochoa-Ryan that she wanted to resign. When Ochoa-Ryan asked whether she could rearrange her class schedule, Clement said that she had already started school and that school was more important. (*Id.*)

Later the same day, Ochoa-Ryan emailed Clark to thank her for her willingness to have Clement "join [her] team" and to let her know that Clement had "decided not to return to TSC due to her school schedule." (Doc. No. 23-9, at 4.) Clark asked, "What happened with her school schedule?" (*Id.*) Ochoa-Ryan answered:

> TSC could not accommodate the days and time that she needed to be removed from work for school. It was in the middle of the day and the decision was made that it would put undue burden on the clinic.

(*Id.* at 5.) Clark responded that the Vein Center could have worked with Clement's school schedule. (*Id.*)

Clement never returned to work after she exhausted her paid leave on June 16, 2020.

Also in mid-June 2020, Analine Jimenez was seeking a school accommodation similar to the plaintiff's. Ochoa-Ryan had conversations with Finn and Fuqua about the strain and chaos that

accommodating multiple school schedules placed on TSC, the impact of the pandemic on the clinics' needs, and the need for consistency across multiple clinic locations. According to Ochoa-Ryan, she and Finn decided that, as a matter of policy, TSC would not continue to accommodate school schedules. (Ochoa-Ryan Dep. 54–56.) Jimenez was notified on June 19, 2020 that TSC could no longer accommodate her school schedule, and Jimenez submitted her resignation on July 8, 2020. (Doc. No. 17-8, Fuqua Decl. ¶ 8.) Another MA at TSC's Downtown Clinic, Monquisha Howse, was attending school at the same time, but she did not miss hours out of any workday to accommodate her class schedule. Instead, she worked a reduced schedule with Fridays off and attended school on her day off. (Fuqua Decl. ¶ 9.)

The plaintiff testified that she thought it was "unfair" that she was being required to change locations, when she had a doctor with whom she worked well and had never had issues at the Downtown Clinic before Taylor's arrival. (Clement Dep. 101.) Clement stated that working at the Vein Center would have added about ten minutes to her commute, but it was next to her school; she also understood that her pay and benefits would not change. She resigned because of the school schedule issue. She claims that the scheduling issue only arose because Ochoa-Ryan, Fuqua, and Taylor were "trying to force [her] to quit" because Taylor "had it in for [her]." (Clement Dep. 103.) She believes that Taylor's animus against her was because of her race. (*Id.* at 85–86, 103.)

Clement confirmed that no one at TSC other than Taylor discriminated against her based on race. Clement asserts that the discrimination took the form of (1) giving Clement two unfair schedules during Taylor's first two weeks at TSC; (2) belittling Clement by talking to her about things like jumping the chain of command in front of coworkers rather than handling it privately; and (3) "allow[ing] a black person and a Hispanic to continue with their school schedule," when Jimenez's schedule, in particular, was almost identical to Clement's, but not allowing the plaintiff

to continue taking classes. (Clement Dep. 103.) She also points to evidence that other employees complained about Taylor, as discussed below. Clement does not allege that Taylor ever used racial slurs or called her names referencing her race, and she has no direct evidence of race discrimination. (Clement Dep. 22–23.)

Asked during her deposition why she initially retained a lawyer, Clement testified that she believed she was being discriminated against "[b]ecause of her race and because of the FMLA guidelines." (Clement Dep. 85.) She stated that she first felt she was being discriminated against "because of the FMLA guidelines" when she received the May 22 email from Taylor outlining her return-to-work conditions. (Clement Dep. 86.) Asked to clarify, Clement stated: "I didn't state that she was discriminating against me for the leave . . . . This wasn't about the FMLA leave. . . . [It was about Taylor's] discriminating against me before the leave [b]ecause of [my] race." (Clement Dep. 86.) Later in her deposition, Clement confirmed that her claim was not premised upon allegations that TSC was trying to "force [her] to quit because [she] had taken FMLA leave." (Clement Dep. 103.) On cross-examination, Clement's attorney sought to rehabilitate the EFMLEA claims by asking whether Clement took EFMLEA leave and whether her job differed when she tried to return from leave. (Clement Dep. 115.) She agreed that her job had changed, in particular because she would have been required to do triage full time. (*Id.*) Asked by her attorney whether she still "felt like [she was] retaliated against for taking FMLA leave," she reconfirmed that she still believed that and was "continuing to pursue that claim." (Clement Dep. 115–16.)

## H.    Other Employees' Impressions of Taylor

Karen Witthauer testified that she complained to several of her superiors about Taylor after she was first hired and that she believed initially that Taylor treated her differently because of race. However, her initial feelings changed after she had worked with Taylor and saw that she "really was a hard worker" and "wanted to do the right thing." (Witthauer Dep. 22.) Witthauer also

acknowledged that, although Taylor appeared to have "favorites," some of her favorites were Black and some were White. (Witthauer Dep. 22–23.)

Karen Burr, a White receptionist, similarly testified that she initially believed that Taylor treated her differently because of race, but she admittedly had no objective basis for that belief. (Burr Dep. 10–11.) As she got to know Taylor better, she came to believe that Taylor was "a manager who came in and tried to make too many changes too fast and didn't get to know the employees first before she did that." (Burr Dep. 22.) By the time Taylor left, Burr believed that she had become a very good manager and was treating everyone fairly. (Burr Dep. 22–23.)

According to Ochoa-Ryan, when Taylor started, several employees lodged complaints about her, and she "had a difficult time dealing with all employees, regardless of their race, due to . . . her lack of maturity and her lack of experience." (Ochoa-Ryan Dep. 79.) Debbie Fuqua testified that, although there were complaints of favoritism based on race, there were Black employees who complained as well. She investigated and "did not see any evidence of favoritism towards anyone because of their race." (Doc. No. 17-2, Fuqua Dep. 113.)

Taylor's problems managing and getting along with employees never completely resolved, and she was "let go" in December 2020. (Fuqua Dep. 32.)

## II.    STANDARD OF REVIEW—RULE 56

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary

under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## III.    DISCUSSION

The Complaint contains two "counts" but effectively five causes of action: (1) interference with rights under the EFMLEA; (2) retaliation in violation of the EFMLEA; (3) reverse race discrimination in violation of the THRA; (4) retaliation in violation of the THRA; and (5) hostile work environment. (Doc. No. 1-2.) The plaintiff has formally conceded that the defendant is entitled to summary judgment on her hostile work environment claim. (Doc. No. 20, at 24 n.4.) As set forth below, the court finds that the defendant is entitled to summary judgment on each of the other claims.

A.       **EFMLEA Claims**

The EFMLEA temporarily amended the FMLA to entitle certain employees to twelve weeks of leave per year "because of a qualifying need related to a public health emergency." 29 U.S.C § 2612(a)(1)(F). A qualifying need includes if "the employee is unable to work (or telework) due to a need for leave to care for [a] son or daughter under the age of 18 years of age of such employee if the school or place of care has been closed, or the child care provider of such son or daughter is unavailable, due to a public health emergency." 29 U.S.C. § 2620(a)(2)(A). EFMLEA leave is paid at two-thirds of the employee's regular rate of pay. 29 C.F.R. § 826.24. Claims for interference and retaliation under the EFMLEA may be brought under the enforcement provisions of the FMLA, 29 U.S.C. § 2617. 29 C.F.R. § 826.151(a) (effective April 2, 2020 through Dec. 31, 2020).

Whether for interference or retaliation, claims under the EFMLEA that, like those in this case, depend on circumstantial evidence are subject to the familiar *McDonnell Douglas* burden-shifting framework. *Accord Atwood v. JCF Residences Mgmt. Co.*, No. 1:20-CV-00056, 2022 WL 185187, at *5 (M.D. Tenn. Jan. 19, 2022) (Campbell, J.) (applying *McDonnell Douglas* in the context of EFMLEA claims). Under this framework, the plaintiff must first establish a *prima facie* claim of interference or retaliation. If the plaintiff establishes a *prima facie* claim, the burden then shifts to the employer to provide a legitimate reason for the termination. If the defendant satisfies its burden, the plaintiff must then put forth evidence to show that the employer's stated reason is pretextual. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (interference); *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (retaliation).

1.       *EFMLEA Retaliation*

To state a *prima facie* case of EFMLEA retaliation, Clement must show that:

(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald*, 667 F.3d at 761; *Atwood*, 2022 WL 185187, at \*5.

The defendant argues here that the plaintiff cannot meet the first or third of these elements because she was not eligible for or entitled to take EFMLEA leave, that she did not suffer an adverse employment action, and that the plaintiff conceded at her deposition that there was no causal connection between her taking leave and the adverse employment action. It also argues that the plaintiff cannot show that TSC's reasons for its actions are pretextual.

The court is not persuaded by the defendant's first argument. TSC contends that the EFMLEA's regulations "specifically identify excludable employees as those" employed as healthcare providers. (Doc. No. 15, at 11.) The EFMLEA regulations define "employer" consistently with the same term in the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(e), and defines "Eligible Employee" as one who has been employed by the employer for at least thirty days. 29 C.F.R. § 826(a) (effective April 2 through Dec. 31, 2020). The regulation to which TSC refers further states that "[a]n Employer whose Employee is a health care provider . . . *may exclude* such Employee from . . . the EFMLEA's Expanded Family and Medical Leave requirements." 29 C.F.R. § 826.30(c)(1) (effective April 2, 2020 through Dec. 31, 2020) (emphasis added). It is undisputed that the plaintiff was employed as a healthcare provider, and TSC argues that, as a result, she was not entitled to take EFMLEA leave. It also argues that it was not required to provide advance notice of its election of the healthcare provider exception.

The flaw in TSC's argument is that it has not provided any evidence that it *ever* elected the healthcare provider exception. It provided the paperwork for the plaintiff to take leave under the EFMLEA, paid her two-thirds of her salary (subsidized by the federal government) for the duration

of her leave period, and anticipated that she would be entitled under the Act to reinstatement following the conclusion of her leave. While TSC did not have an obligation to notify Clement before she took leave that it had elected the exception, *accord Valdivia v. Paducah Ctr. for Health & Rehab., LLC*, 507 F. Supp. 3d 805, 810 (W.D. Ky. 2020), that does not mean that TSC can retroactively invoke the exception after the plaintiff filed suit asserting EFMLEA claims.

As for the adverse employment action, the defendant argues that the plaintiff's decision to quit does not constitute a materially adverse action and that the plaintiff cannot meet the high bar of showing that she suffered a constructive discharge. The defendant's constructive-discharge arguments, however, are entirely beside the point. The challenged employment actions are that Taylor emailed the plaintiff stating that the prior schedule agreement would be "null until COVID is over," that the plaintiff would be expected to work from 7:30 a.m. to 4:00 p.m., and that she would be working full time as the triage MA and assigned to a workspace on the fourth floor. (Doc. No. 17-2, at 36.) As the plaintiff points out, the defendant's emails show that it anticipated that these changes—the start time in particular—would force the plaintiff to quit. (*See* Doc. No. 23-8, at 35.) After the plaintiff challenged these changes, Ochoa-Ryan attempted to work with her by finding another clinic that would accommodate her working hours but informed her that TSC would no longer accommodate her class schedule. The refusal to accommodate her school schedule was the decision that ultimately caused the plaintiff to quit.

In the retaliation context, the burden of establishing a materially adverse action is "less onerous" than in the "anti-discrimination context." *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (citations omitted). The appropriate question is whether a reasonable employee would find the challenged action to be materially adverse, such that it might dissuade a reasonable employee from engaging in the protected conduct—here, taking EFMLEA leave. *See id.* The court

finds that there is at least a question of fact as to whether the plaintiff suffered a materially adverse action for purposes of her retaliation claim when the defendant threatened to make material changes to the plaintiff's schedule and job responsibilities, backed down from that proposal only when the plaintiff objected and retained an attorney, and then determined that it would no longer accommodate her school schedule under the previously negotiated schedule agreement.

As for the causal connection, the defendant argues that it "defies logic" that the defendant would provide paid leave that it did not have to provide and then be angry at the plaintiff for taking it. (Doc. No. 15, at 15.) However, it is unclear that the defendant knew at the time that it could have elected an exemption under the healthcare provider exception in the EFMLEA. TSC also argues that the plaintiff offers no evidence of causation and essentially conceded this claim when she stated several times in her deposition that she did not believe that her taking leave had anything to do with the materially adverse action. This argument is more persuasive. Although her attorney attempted to rehabilitate the EFMLEA claims on cross-examination, he never asked Clement to clarify her earlier testimony, and the answers he did elicit were somewhat ambiguous.

Notably, as set forth above, the attorney asked Clement whether her job conditions were going to be different after she returned from leave than they were before. She stated that they were and, in response to leading questions, agreed that she still "fe[lt] like [she was] retaliated against or discriminated against for taking FMLA leave" and that she was "continuing to pursue that claim." (Clement Dep. 115–16.) At best, this questioning clarified that the plaintiff still believed that the defendant interfered with her right under the EFMLEA to be reinstated to the same or an equivalent position—but not that it retaliated against her for taking leave. The court finds that the plaintiff expressly and unequivocally abandoned this latter claim when she stated several times that she did not believe that TSC was trying to make her quit because she had taken leave (*see*

Clement Dep. 86 (confirming that Taylor's May 22 email "wasn't about the FMLA leave"); *id.* at 103 (stating that Taylor, Fuqua, and Ochoa-Ryan were "trying to force [her] to quit" because of her race)) and when, in response to the question whether she was raising a claim based on allegations that Ochoa-Ryan, Fuqua, and Taylor were "trying to make [her] quit because [she] had taken FMLA" leave, the plaintiff stated, "No, not raising" (Clement Dep. 104–05).

The plaintiff's EFMLEA claim, therefore, fails because she cannot establish a *prima facie* case. Even if she could, however, she cannot show that the defendant's reasons for its actions were pretextual and that the actual reason was her taking leave. A plaintiff may establish pretext by showing that the employer's proffered reasons "(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger*, 681 F.3d at 285 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against him." *Id.* (citation omitted; alterations in original).

The defendant's reasons for its action are that the guidelines for the plaintiff's return to work set forth in Gabrielle Taylor's May 22 email were "driven by the nine complaints received from six of Plaintiff's co-workers, the impact the pandemic was having on the clinic, the other MA's roles, the other employees who were out on leave, and the need for workflow, desk assignment and schedule changes at the Downtown Clinic." (Doc. No. 15, at 22; see SUF no. 62.) It asserts that Ochoa-Ryan's offer to transfer the plaintiff to another clinic was based on the plaintiff's "ongoing inability to get along with Taylor" (Doc. No. 15, at 22) and that the decision to no longer allow Clement time off in the middle of her workday to attend school was based on her and Finn's determination that "accommodating multiple school schedules" was placing

additional "strain and chaos" on TSC that it could no longer absorb, given the "impact of the pandemic on the clinics' needs, and the need for consistency across multiple clinic locations." (Doc. No. 15, at 22 (citing Ochoa-Ryan Dep. 53–56).)

The record is abundantly clear that the plaintiff and Gabrielle Taylor had a personality conflict basically from the second week after Taylor began working as the plaintiff's direct supervisor, and the emails submitted by the defendant establish, at the very least, that TSC had reason to believe that the plaintiff's disrespectful attitude toward Taylor was adversely affecting the work environment at the Downtown Clinic. The plaintiff has not shown that Ochoa-Ryan's decision that the plaintiff needed to be placed in a different clinic upon her return to work in order to separate her from Taylor had no basis in fact, did not actually motivate the decision, or was insufficient to motivate the action. Moreover, the plaintiff admits that the reason she quit rather than return to work was that TSC would no longer accommodate her school schedule, and she cannot rebut Ochoa-Ryan's assertion regarding the reasons why TSC decided across the board to stop accommodating school schedules that interrupted employees' workdays during the summer of 2020—that they simply added another layer of chaos on top of the complexity and stress imposed by the realities of dealing with a pandemic. The plaintiff does not dispute that TSC notified Jimenez at about the same time it notified the plaintiff that it would no longer accommodate Jimenez's school schedule either.

The plaintiff, instead, attempts to show pretext by arguing that (1) the majority of the employee complaints were gathered in mid-February 2020, and none was brought to her attention until just before she sought to return to work after taking leave; (2) she had never before been disciplined; (3) there was no reason TSC could not have addressed the complaints against her before she went on leave; (4) Taylor's email does not make any reference to the impact of COVID

on the Downtown Clinic's operations; (5) the clinic to which TSC sought to transfer her would have been willing to accommodate the plaintiff's school schedule; and (6) the email correspondence between Taylor and Ochoa-Ryan conclusively demonstrates that they did not intend to let Clement return to work after her leave and that the scheduling changes outlined in Taylor's email to Clement were imposed with the knowledge that these changes would force Clement to quit.

These arguments are, for the most part, beside the point, as they do not establish that the defendant's reasons for its adverse actions were pretextual. The fact that the employee complaints were not brought to Clement's attention does not mean that they were not in her file. Moreover, the record establishes that the ongoing conflict between her and Taylor continued until the plaintiff actually went on leave. The fact that the Vein Center would have been willing to accommodate the plaintiff's school schedule does not render unreasonable TSC's across-the-board decision to stop accommodating school schedules during the summer of 2020.

Because the plaintiff admits that there is no causal connection between her taking EFMLEA leave and the adverse employment actions, and because she cannot establish that the defendant's reasons for its actions are pretextual, the defendant is entitled to summary judgment on the plaintiff's EFMLEA retaliation claim

### 2. *EFMLEA Interference*

Although the defendant did not initially address it, the plaintiff's Complaint clearly articulates the legal elements of an EFMLEA interference claim and factual support for such a claim—albeit without using the word "interference." (*See* Doc. No. 1-2 ¶¶ 13–18, 22–24.) The elements of an EFMLEA *prima facie* claim are that: (1) the plaintiff was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the plaintiff was entitled to leave under the EFMLEA; (4) she gave TSC notice of her intention to take leave; and (5) the employer

denied the employee EFMLEA benefits to which she was entitled. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (FMLA interference); *Atwood v. JCF Residences Mgmt. Co.*, No. 1:20-CV-00056, 2022 WL 185187, at *5 (M.D. Tenn. Jan. 19, 2022) (Campbell, J.) (articulating the same elements in the context of an EFMLEA claim).

The plaintiff has stated a *prima facie* case. As set forth above, she is an eligible employee as defined by the EFMLEA and the FMLA; TSC is an "employer" under the law; there is no evidence that TSC elected the healthcare provider exception; and there is no dispute that Clement gave notice of her intent to take leave under the EFMLEA. As for the fifth element, the benefit with which the plaintiff claims TSC interfered was her right to be "reinstated to her position or to a position equivalent in pay, benefits, and other terms and conditions of employment." *Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472, 476 (6th Cir. 2019); 29 U.S.C. § 2614(a)(1). There is a question of fact as to whether the plaintiff would have been returned to the same or equivalent position, in light of TSC's decision to revoke the schedule agreement and to no longer accommodate her ability to attend school during the middle of the workday. Moreover, the plaintiff's deposition testimony does not make it clear that she intended to abandon or concede this claim.

Regardless, the defendant is entitled to summary judgment on this claim as well, because Clement cannot establish that the reasons for the adverse action are pretextual. The FMLA and the EFMLEA are not strict liability statutes. The Sixth Circuit has held that, "[i]f an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Donald*, 667 F.3d at 761 (quoting *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007)). Alternatively, taking leave does not insulate the plaintiff from employment actions that would have

occurred, even if she had not taken leave. *Accord Seeger*, 681 F.3d at 285. In this case, the plaintiff simply cannot establish that TSC took any action against Clement because of her decision to take leave.

**B.    THRA Claims**

*1.    Race Discrimination*

The plaintiff's THRA race discrimination claim is analyzed by the federal courts consistently with a Title VII race discrimination claim. *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008). Generally, to establish a race discrimination claim in the absence of direct evidence of discrimination, a plaintiff may rely on circumstantial evidence. In the Sixth Circuit, as elsewhere, to prove a race discrimination claim based on circumstantial evidence, a plaintiff must first establish a *prima facie* case of discrimination by showing that"(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). If the plaintiff makes such a showing, the burden shifts to the defendant to "offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id.* A successful showing on the part of the defendant then shifts the burden back to the plaintiff to prove that the defendant's proffered reason was "merely a pretext for discrimination." *Id.* at 391–92.

When a plaintiff alleges *reverse* race discrimination, however, he bears the heightened burden of "demonstrating that he was intentionally discriminated against despite his majority status." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (citation and internal quotation marks omitted)). The Sixth Circuit has modified the *McDonnell Douglas prima facie* test to make it applicable when "a member of the majority is claiming discrimination on the basis of race." *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003). In that

situation, the first prong of the *McDonnell Douglas* test is modified to require that the plaintiff demonstrate "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002) (quoting *Murray*, 770 F.2d at 67). The fourth prong is similarly modified to require that the plaintiff show that he "was treated differently than similarly situated employees of a different race." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 837 (6th Cir. 2012).

The plaintiff's claim falters at the first element of her *prima facie* case. Courts have found litigants to have met the "background circumstances" requirement through a variety of means, including by presenting statistical evidence or employment policies showing a history of unlawful consideration of race by the employer, *Sutherland*, 344 F.3d at 615, evidence that the person responsible for the challenged employment decision was a member of a racial minority, *Zambetti*, 314 F.3d at 257, or evidence of ongoing racial tension in the workplace, *Boger v. Wayne Cty.*, 950 F.2d 316, 324–25 (6th Cir. 1991).

TSC argues that the plaintiff cannot show such background circumstances in this case, as there is no evidence that it has a history of unlawful consideration of race in making employment decisions, that Taylor actually made any of the decisions to which the plaintiff objects, or that there was ongoing racial tension in the workplace. In response, the plaintiff contends that there is sufficient evidence in the record to establish that Taylor discriminated against her because she is White. She argues that Taylor was responsible for the unfair schedules to which the plaintiff objected and the proposed terms and conditions of her reinstatement, that Taylor hired only black employees, and that there was "consistent testimony" that she favored Black employees. As the defendant argues in its Reply, however, the plaintiff could not give an example of any other

employee—White or Black—who complained about his or her schedule; the evidence in the record indicates that, while Taylor had certain "favorite" employees, some of them were White and some were Black; both Black and White employees complained about the plaintiff's attitude; and Ochoa-Ryan and Finn (both White)—not Taylor—were ultimately responsible for the decision to transfer the plaintiff to a different clinic in order to separate her and Taylor, as well as the decision not to allow the plaintiff (or Jimenez) to continue to attend school during the middle of the work day during the summer of 2020. The racial tension to which the plaintiff refers appears only to have existed in her own mind.

Regarding the plaintiff's assertion that Taylor hired only Black employees during her tenure, she does not provide any supporting information, such as "(1) the positions to which she is referring; (2) other applicants for those positions; (3) that there were actually white applicants for those positions; [or] (4) that the applicants chosen were less qualified than others who applied." (Doc. No. 25, at 13.) In the absence of this type of evidence, the plaintiff's bare assertion that Taylor only hired Black applicants is meaningless. In addition, the record is clear that Taylor also fired Black employees and that one of the factors that ultimately led to Taylor's discharge was a complaint by a Black employee about how Taylor handled an already approved leave request. (Fuqua Dep. 35–36.)

The court concludes, in sum, that the plaintiff has not pointed to sufficient evidence in the record to establish that TSC is the rare employer that discriminates against the majority. On this basis alone, the defendant is entitled to summary judgment on the plaintiff's reverse race discrimination claim. In addition, however, even if the plaintiff were able to establish a *prima facie* case, she still cannot rebut TSC's proffered non-discriminatory reasons for the adverse

employment action, for the same reasons as those discussed above.[5] On this basis as well, the defendant is entitled to summary judgment.

## 2. *THRA Retaliation*

The same conclusion dooms the plaintiff's THRA retaliation claim. Even assuming that Clement can establish a *prima facie* case of THRA retaliation, based on her May 27, 2020 email making a "formal complaint" of race discrimination (Doc. No. 17-1, at 53) and TSC's subsequent decision not to accommodate her school schedule, the plaintiff cannot establish that that decision was pretext for retaliation. The defendant is entitled to summary judgment on this claim as well.

## IV. CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be granted. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

---

[5] For purposes of her race discrimination claim, as opposed to her retaliation claims, the only materially adverse employment action to which the plaintiff can arguably point is the revocation of the schedule agreement that allowed her to attend school during the workday. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) ("An adverse employment action in the context of a . . . discrimination claim is a materially adverse change in the terms or conditions of employment because of the employer's actions." (internal quotation marks and citation omitted)). It is undisputed that Taylor was not involved in that decision.